**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Raymond P. Moore**

**Civil Action No. 11-cv-01896-RM-KLM**

CAROL GILL-MULSON and JOHN H. WILLSON,

    Plaintiffs,

v.

EAGLE RIVER FIRE PROTECTION DISTRICT,

    Defendant.

---

## ORDER

---

Plaintiffs Carol Gill-Mulson and John H. Willson ("Plaintiffs") bring this action against their former employer, Defendant Eagle River Fire Protection District ("Defendant" or the "District"), alleging promissory estoppel and deprivation of property interests without due process. More specifically, Plaintiffs allege that the District is estopped to deny a promise which converted their at-will employment to a more secure status, and that the secure status gave rise to a property interest which supports a claim under 42 U.S.C. § 1983. By agreement of the parties, the Court presided over a trial to the bench on January 7, 2014 on the liability aspects of Plaintiffs' promissory estoppel claim. Pursuant to Federal Rule of Civil Procedure 52(a)(1), the Court makes the following findings of fact and conclusions of law.

### I. FINDINGS OF FACT

    1. Defendant is a fire protection district servicing parts of Eagle County, Colorado. Defendant is a special district and governmental subdivision of the State of Colorado subject to the requirements of Title 32 of the Colorado Revised Statute governing such districts within the state.

2. Mr. Willson began employment with Defendant in September 1986, and became a full time firefighter in 1989. Mr. Willson left Defendant's employ in 1995, but returned to Eagle County and was re-hired by Defendant in 2002. Mr. Willson "rose through the ranks" and was named Deputy Chief of Operations in 2007.

3. Ms. Gill-Mulson began employment with Defendant in January 1983 as a firefighter and engineer. She was eventually promoted to Fire Marshal and Deputy Chief in charge of prevention and public education.

4. Neither Plaintiff was hired pursuant to any written or express contract, and neither's hire was for a set term of years. Both Plaintiffs were hired as at-will employees.

5. Each of the Plaintiffs signed an "Acknowledgment of Receipt" of Defendant's employee handbook. Ms. Gill-Mulson signed on December 27, 2005; Mr. Willson signed on January 1, 2008. In those acknowledgments, each affirmed that he or she understood the following provisions:

> [N]either the employer nor myself is committed to an employment relationship for a fixed period of time. Employment with the Eagle River Fire Protection District is at-will. Both Management and I have right to terminate this employment at any time for any reason. The language used in this handbook and any verbal statement of Management are not intended to constitute a contract of employment, either express or implied, nor are they a guarantee of employment for any specific duration…
>
> [N]o representative of the Eagle River Fire Protection District, other than the Chief of the District, has the authority to enter into an agreement of employment for any specific period and such agreement must be in writing, signed by the Board of Directors and myself. We have not entered into such an agreement.

6. Although neither Plaintiff was a member of Defendant's Board of Directors, both frequently attended Board meetings. In the year prior to January 2010, Plaintiffs

    each attended the vast majority of the Board meetings.  Plaintiffs were aware of the Board's methodologies and procedures.

7. Beginning in approximately 2008 and continuing into 2010, the general economic downturn across the county was becoming a matter of increasing concern for the District whose revenues were significantly dependent on property taxes.

8. From time to time, the District would hold "all-employee meetings" at which the Board of Directors and/or the Fire Chief would discuss matters of importance with employees.  This would present an opportunity for regular employees to hear from and interact with Board members and other management.

9. On January 21, 2010, both a special meeting and a regular meeting of the Board of Directors were held.  Plaintiffs attended these meetings.  Later that afternoon, the District additionally held an all-employee meeting (the "January Meeting") at 4:30 in the afternoon.  Members of the Defendant's Board of Directors, the Fire Chief, and about 75 District employees were present at the January Meeting.  Plaintiffs were among those present.

10. At the January Meeting, Mr. Ed O'Brien, Chairman of Defendant's Board of Directors, was the primary speaker who addressed the employees.  The purpose of the January Meeting was to discuss the financial condition of the District and how the District was going to move forward.

11. Mr. Willson testified that at the January Meeting, Mr. O'Brien told all employees words to the effect that "all jobs were secured until the 2012 period."  Mr. Willson interpreted this as a promise of continued employment until that time.  Moreover, Mr. Willson understood Mr. O'Brien's words as meaning that all

3

employees were converted from at-will employees to for-cause employees who could only be terminated for cause until the end of 2011.

12. Independently of anything said by Mr. O'Brien, Mr. Willson also believed that if staff reductions were to happen, the reductions would likely be made at a lower level of staff than the senior, supervisory level where he served.

13. Ms. Gill-Mulson did not, on direct examination, testify as to any specific statement made by Mr. O'Brien at the January Meeting. Instead, she testified as to her "understanding" upon having heard Mr. O'Brien speak. That understanding was that "positions were secure" until the District had confirmation of what the assessed property valuations were going to be in 2011. The only timeline that Ms. Gill-Mulson referenced was related to the assessment. She testified that she knew the certification would occur "in August" and thought "perhaps we were going to be working until the end of 2011." According to Ms. Gill-Mulson, Mr. O'Brien "did not" make "any reference" to any specific month or year when he was discussing job security.

14. As had Mr. Willson, Ms. Gill-Mulson testified that following the January Meeting, she believed that she could only be terminated for cause. On cross examination, she admitted that Mr. O'Brien "didn't say you are now only to be terminated for cause."

15. In terms of the assessment, Ms. Gill-Mulson conceded that information concerning the assessed valuation to which Mr. O'Brien referred could have been available "as early as June 30, 2010."

16. In the early portion of 2010, Defendant secured the services of a consultant to review the District's financial situation. That individual, Stan Bernstein,

presented the Board with different scenarios or proposals for addressing what was recognized as an impending financial crisis. One of those proposals involved reducing the number of supervisory positions in the District.

17. Defendant terminated Plaintiffs' employment on August 19, 2010. About that time, another of Defendant's employees, Charles House, who worked with Ms. Gill-Mulson as Assistant Fire Martial, was also terminated.

18. Mr. House had also attended the January Meeting, and he recalled Mr. O'Brien assuring the employees that "the district was committed to maintaining their jobs, up until the point that financial realities may impact future jobs…[h]is assurances were that even though there would be no employee impact up until that particular point in time, as far as jobs or job status."

19. The minutes of the Board meeting for January 21, 2010 were admitted into evidence. The minutes include the special meeting, regular meeting, and employee meeting which occurred on that day. The minutes reflect no action by the Board with respect to the promise Plaintiffs allege was made, no mention of any assurance of employment for the future, no discussion of conversion of the status of employment for the District's employees from at-will to for-cause, or any other action which could be construed as such. The minutes, however, are not verbatim transcripts of the events occurring at any meeting.

20. Mr. O'Brien testified at trial that he did speak at the January Meeting, and that he spoke about the financial history and circumstances facing the District. He specifically denied making any assurance or promise of job security to any employees at the January Meeting.

21. Mr. O'Brien further testified that the District was compelled to comply with the open meetings act under Colorado law. Any policy-making decision required Board action, publically noticed, at a public meeting. He testified that matters relating to expenditures of resources by commitments to employees versus capital expenditures would have required a decision by the Board in an open meeting, publically noticed. According to Mr. O'Brien, no such action ever occurred. No Board minutes reflect any such action.

22. Mr. O'Brien testified that he had no "cloak" or authority to do what he wanted apart from the Board as a whole, in terms of announcing or making decisions for the Board.

23. The following witnesses also testified at trial that they were at the January Meeting and that Mr. O'Brien made no promise whatsoever of continued or assured employment: Charlie Moore, the former Fire Chief; Kristen Nash, the District's human resources director and also the person in charge of keeping Board minutes; Karl Bauer, a Deputy Chief at the time of the January Meeting; George Wilson, head of the Local Firefighter's Union at the time of the January Meeting; Clark Shivley, a Board member, and Jennifer Cartmell-Hayes, also a Board member.

24. Following the January Meeting, Mr. Willson testified that he continued to look for jobs in more desirable locations with greater compensation, just as he had prior to the January Meeting.

25. Ms. Gill-Mulson testified that she purchased a new car after the January Meeting that she would have purchased eventually, but would have delayed, were it not for the promise by Mr. O'Brien.

6

26. Ms. Gill-Mulson also testified that she refinanced her home, took $30,000 out of her pension to pay down debts, went on vacation, and participated in an Avon Walk for Cancer after the January Meeting—all decisions she testified would most likely have come out differently were it not for Mr. O'Brien's promise.

27. Mr. O'Brien did not, at the January Meeting, make any promise, assurance, commitment or guarantee of "secure employment," continued employment or guaranteed employment for Plaintiffs at all—much less for any identifiable period of time—and did not otherwise make any statement purporting to alter or limit the nature of Plaintiffs' at-will employment.

## II. JURISDICTION

Plaintiffs currently have two claims related to their termination: (1) a claim under 42 U.S.C. § 1983 alleging that Plaintiffs were deprived of Fourteenth Amendment property interests and rights in their employment without due process of law, and (2) a claim, on which the § 1983 claim depends, asserting that Defendant is "promissorily estopped from denying its agreement with Plaintiffs." (Am. Comp. ¶¶ 27, 29.) This Court has jurisdiction pursuant to 28 U.S.C. § 1331 over the civil rights claim pursuant to 42 U.S.C. Section 1983; and supplemental jurisdiction over the state law claim pursuant to 28 U.S.C. § 1367(a).

## III. CONCLUSIONS OF LAW

The issue of whether Plaintiffs could make out a claim for promissory estoppel was previously before the Court at the summary judgment stage, and Defendant's motion was denied. At that stage in the proceeding, Plaintiffs were entitled to all favorable inferences and to an opportunity to develop more fully the context in which the alleged promise was made. Now, after hearing the full evidence, the Court rules against the Plaintiffs on their claim for promissory estoppel.

A.     **Promissory Estoppel**

"Under Colorado law, an employee hired for an indefinite period of time is an at-will employee, whose employment may be terminated by either party without cause and without notice, and whose termination does not give rise to a cause of action." *Vasey v. Martin Marietta Corp.*, 29 F.3d 1460, 1464 (10th Cir. 1994) (internal citations omitted).  Even where no actual contract for a more permanent employment status exists, an employee may demonstrate that conditions have been imposed upon the at-will relationship based on a theory of promissory estoppel.

In *Soderlun v. Public Serv. Co.*, the Colorado Court of Appeals discussed the requirements for a promissory estoppel claim, saying that "to constitute an enforceable promise," an employer's statement "must either disclose a *promissory* intent or be one that the employee could reasonably conclude constituted a *commitment* by the employer." 944 P.2d 616, 620 (Colo. App. 1997) (emphases in original).  The court explained that if such statement "is merely a description of the employer's present policies or a forecast of the employee's likely career progression, it is neither a promise nor a statement that could reasonably relied upon as a commitment." *Id*.  A further requirement is that the employer statement also "must be sufficiently definite to allow a court to understand the nature of the obligation undertaken." *Id.* at 621.  *See also Watson v. Pub. Serv. Co. of Colorado*, 207 P.3d 860, 869 (Colo. Ct. App. 2008) ("In the employment context, to be enforceable the employer's statement must disclose a promissory intent or be reasonably construed as a commitment by the employer, and it must be sufficiently definite to allow a court to understand the nature of the obligation undertaken.").

"The purpose of promissory estoppel is to provide a remedy, under certain circumstances, to those who rely to their detriment upon promises which the promisor should have reasonably expected to induce such reliance. In the absence of a promissory estoppel cause of action, these

8

promises would not be enforceable, generally due to a lack of consideration or a failure of the parties to reach a mutual agreement. The development of the cause of action reflects an attempt by the courts to keep remedies abreast of increased moral consciousness of honesty and fair representations in all ... dealings." *Vigoda v. Denver Urban Renewal Auth.*, 646 P.2d 900, 905 (Colo. 1982) (internal quotations omitted).

In order to make out a claim for promissory estoppel in the employment context in Colorado, a plaintiff must prove the following elements: (1) the promisor made a promise to the promisee; (2) the promisor should reasonably have expected that the promise would induce action or forbearance by the promisee; (3) the promisee in fact reasonably relied on the promise to the promisee's detriment; and (4) the promise must be enforced to prevent injustice. *Marquardt v. Perry*, 200 P.3d 1126, 1129 (Colo. Ct. App. 2008).

  *i. Did Defendant make a promise to Plaintiffs?*

Plaintiffs, in order to meet their burden under Colorado law, must point to a specific, definite promise that Defendant made to them, one that is more than evidence of a current policy or practice on the part of the employer. Plaintiffs here point to the presentation made by Mr. Ed O'Brien at the January 21, 2010 meeting, saying that it contained a promise by and on behalf of the District "that no one would be laid off for financial reasons during a specific and definite time period." (ECF No. 72 at 7.) However, at trial, Plaintiffs failed to meet their burden that such a promise was made.

I conclude that no promise was made by Mr. O'Brien at the January Meeting. He specifically denied that any such promise was made. Others agreed that no such promise was made, including the then Fire Chief, the then head of the local union, and two other members of the Board. No documentary evidence of such a promise was shown to exist. And absent full Board action, which did not occur, Mr. O'Brien had no authority to make any promise affecting

the employment status of the entire District's employees. Of the multitude of people present at the January Meeting, the only ones to claim that a promise of some form of "secure employment" was made were three people whose positions were eliminated for financial reasons in August 2010.

The Court is mindful that the number of witnesses on one side or the relative interests of the parties is not controlling. But even were I to disregard the evidence suggesting the absence of a promise, I would be hard pressed to be able to discern the parameters of the promise supposedly made. That is because Plaintiffs' testimony is inconsistent, if not contradictory.

Mr. Willson testified to an assurance with a time component—until the end of 2011 or beginning of 2012. Ms. Gill-Mulson was clear that there was no time component, but that jobs were secure until an event—information was available with respect to an assessment. And in terms of this information regarding the assessment, she admitted that it—and thus the end of the period of job security—may have been available as early as June 2010, a date prior to her termination. In terms of the alleged promise, both Plaintiffs were clear that it meant that their employment was converted for a limited time from at-will to for-cause employment, and that they could only terminated for cause during the period of protection. Yet Plaintiffs could point to no statement of Mr. O'Brien referencing at-will or for-cause employment. Moreover, Mr. House, the third terminated employee to testify, would not support this construction. When asked on direct examination whether he was no longer an at-will employee after the January Meeting, he said, "Well I don't know about the 'at-will'… that didn't enter my mind."

Far more likely than any promise was some vague assurance to employees. Nonetheless, "'mere vague assurances' are unenforceable." *Haynes v. Level 3 Commc'ns, LLC.,* 167 F. App'x 712, 715 (10th Cir. 2006) (quoting *Hoyt v. Target Stores*, 981 P.2d 188, 194 (Colo.App.1998)). Plaintiffs did not meet their burden of demonstrating that Mr. O'Brien made statements at the

January Meeting which contained or constituted a clear and definite promise to them. Even if some statement concerning their employment was made, it was at best a vague assurance falling short of an enforceable promise.

Quite simply, after hearing all testimony from the witnesses for both sides, I do not believe there was any promise made, much less one of the specific, definite nature required to sustain a promissory estoppel claim. *Hoyt*, 981 P.2d at 194. As noted above, Mr. O'Brien denies that he made a promise in any form with regard to assurances or guarantees of employment. Regardless of whether the alleged promise was to convert employees to for-cause employees, or to simply limit their at-will status by imposing a "no layoffs" policy on that status, the evidence fails to establish the making of such a promise.[1] There were at least two board members in the room who testified at trial, and each of them said that had a promise affecting employment been made, they would have objected, and in the words of one, objected "vehemently." The Court finds this testimony convincing.

    *ii.    Should Defendant have reasonably expected Plaintiffs to rely on the purported promise?*

Having determined that no promise was made, the issue of whether the District should have expected Plaintiffs, and presumably all other District employees, to rely on the asserted promise is essentially moot. But even were I to entertain the possibility that some "promise" was made, Plaintiffs failed to present credible evidence as to this issue.

---

[1] Plaintiffs elicited testimony at trial that very few employees voluntarily left the District following the January Meeting. To Plaintiffs, this fact circumstantially establishes that some promise of job security was made. Plaintiffs argue that had the financial condition of the District been dire and explained to employees, many would have sought to secure other employment. The Court acknowledges the reasoning, but rejects the argument. Other than the terminated employees, no person testified that any statement of job security was made. And no other person testified that he or she stayed with the District because of such a promise. Moreover, no figures regarding the rate at which employees voluntarily left the District before the January Meeting were presented. Nor was evidence presented as to such matters as the availability of other jobs in other fire departments. In short, Plaintiffs' argument is simply argument. It is not an adequate basis for finding a promise or for defining the parameters of any alleged a promise.

The argument proffered by Plaintiffs was this: since the promise was made by the Chairman of the Board of Directors and neither the other Board members nor the Fire Chief challenged or disagreed with the stated promise, the District should have expected that Plaintiffs would have relied on the promise. The obvious problem with such a contention is that it requires the Court to ignore the most obvious and reasonable explanation for why Board members did not object to a statement which was not the product of any Board meeting or official action—no such statement was made—in order to reach a conclusion not supported by any evidence. That conclusion would be that Board members would acquiesce in what Mr. O'Brien chose to say, regardless of whether his actions conformed with the law, because he was the Chairman. Or possibly the conclusion would be that there had been some action taken or agreement made by the Board in a meeting that was not publically noticed or held at which the Board took the action announced by Mr. O'Brien. Regardless of which of these possibilities Plaintiffs would have the Court believe, there is no evidentiary basis for either.

  iii.    *Did Plaintiffs reasonably rely on Defendant's promise?*

The answer to this question is no. In the context of the January Meeting, where the uncertain and worsening financial outlook was the topic of conversation,[2] the Court cannot find that Plaintiffs could reasonably have relied on what was, if anything, a vague and indefinite assurance of job security.

Factoring into this analysis is the underlying agreement Plaintiffs had with Defendant governing their employment. Both Plaintiffs expressly acknowledged in writing that they were at-will employees. The acknowledgement said that the employment agreement could not be

---

[2] In this regard, an employee letter was read aloud at the January Meeting where employees recognized their at-will employment and committed to find ways to help reduce costs across the District.

changed except in writing signed by the Chief and the Board of Directors. The agreement also said that verbal statements of management could not guarantee employment for any duration.[3]

Further, Plaintiffs were not employed in a private industry; they were in public employment, employed by a quasi-governmental entity that was required to make decisions in the public interest and that was constrained by law in how it could act. Defendant acted through a Board of Directors, as Plaintiffs were well aware, which was required to hold open meetings in public. Plaintiffs were frequent attendees at Board meetings and understood how the Board operated. There was not a shred of evidence presented that there was any formal Board decision taken regarding the granting of job security to the District's employees. And absent such action, it was not reasonable for Plaintiffs to rely on the purported oral statements of a single Board member.

The Tenth Circuit has established that even if Plaintiffs were ignorant of the requirements imposed on governmental entities, they are chargeable with that knowledge. *See Schulz v. City of Longmont, Colorado*, 465 F.3d 433, 436 (10th Cir. 2006) (holding that officers employed by the City of Longmont could not have reasonably relied on representations made that were beyond the municipality's authority). Here, the Court need not even rely on *Schulz* to reach that conclusion, since Plaintiffs went regularly to Board meetings, were familiar with how they operated, and were in fact at the special and regular sessions of the Board meeting just prior to the January Meeting. No action to "secure" employment was taken at the earlier meetings.

Was it reasonable for anyone to believe that, in the midst of a financial crisis,[4] employees would actually have in a *heightened* degree of job security? I find that the answer is no.

---

[3] Plaintiffs took the position at trial that Mr. O'Brien, Chairman of the Board of Directors for the District, was not "management," and therefore they were entitled to rely on his verbal statement. The Court finds that position creative, but not credible.
[4] Plaintiffs devoted considerable effort at trial to presenting evidence to suggest that the financial condition of the District was not as dire as the District claimed. An example of this effort was repeated testimony about the

*iv.  Did Plaintiffs in fact rely on the promise to their detriment?*

The evidence also fails to establish that Plaintiffs relied on the purported promise to their detriment. Detrimental reliance can be shown where a party alters his or her position as a consequence of another's conduct. *City of Thornton v. Bijou Irrigation Co.*, 926 P.2d 1, 77 n.72 (Colo. 1996). Plaintiffs essentially argued that had they known they were going to be fired, they would have exercised a greater degree of forbearance in their financial decisionmaking, and also worked harder earlier to find alternative employment. But the question is not what they would have done if they knew they were going to be terminated—as at-will employees, their employer was under no obligation to provide advance warning of termination. The pertinent inquiry is, if Mr. O'Brien had not said what he is claimed to have said, would Plaintiffs have acted differently? Before January 21, 2010, when Plaintiffs were at-will employees by both parties' admission, they were not looking for new jobs at a higher rate than they were in the time period afterwards. Nor was their conduct otherwise different after the January Meeting.

Mr. Wilson, for instance, testified that he was looking for jobs both before and after the January meeting. He testified that he would have looked for even less favorable jobs had Mr. O'Brien not made the statement. But his own testimony cuts against that notion. It is clear that he believed that even if cuts were coming, his job would be among the last to be chopped. It does not stand to reason that if Mr. O'Brien had simply said nothing regarding job security at the January Meeting, Mr. Willson would then, despite his personal belief, have concluded that he needed to find alternative work immediately. Furthermore, his evidence of actual detrimental

---

District's acquisition of a house in which the successor to Chief Moore currently resides. The suggestion was two-fold. First, that Plaintiffs did not need to be terminated. And second, that the promise of security was not extraordinary given that the District had available funds. As to the first suggestion, the necessity or even accuracy of the purported reason for Plaintiffs' terminations might be relevant to some Title VII or other claim not before the Court, but such inquiries do not suffice to establish that the District "secured" all jobs in January 2010. As to the second suggestion, Mr. O'Brien testified, and the Court accepts the explanation, that administering the District involves a balancing of decisions affecting the short term and long term interests of the District. Regardless of whether certain decisions of the Board may be questioned, the weight of the evidence is that the District and its consultant perceived an immediate and dire financial crisis in 2010.

reliance is difficult to quantify.  As far as the evidence shows, there was not a single job opportunity which he could identify as one that he knew about and did not pursue due to Mr. O'Brien's purported statement.

As for Ms. Gill-Mulson's evidence of detrimental reliance, it is equally deficient.  She took $30,000 out of her pension in order to pay down some bills.  She testified that she "do[esn't] believe" she would have done that if she did not believe she had a secure job through 2011.  But she testified that she did not know whether her job was secure for six months or two years, so this financial logic is dubious.  Even if it were two years, the notion that she would have recovered anything close to $30,000 in retirement contributions over a two year period does not withstand scrutiny—there was no evidence put forth that $15,000 a year in retirement contributions were being made.

Putting these concerns to the side, the detrimental reliance is hard to see with respect to Ms. Gill-Mulson's actions.  She withdrew money to pay off debt that she had incurred prior to January 2010, and so she was arguable in a better financial position than she would have been.  She made a decision that was aimed at reducing her debt, not that was aimed at incurring debt.  She never testified that she ended up in more debt or otherwise in a worse financial circumstance as a result of her decisions after the January Meeting.  She simply noted her decisions, and testified that she might not have made those decisions if it hadn't been for the January Meeting.  As for her job search activities, she was asked directly if she "change[d her] job search strategies…after Mr. O'Brien's comments" and she replied "I didn't change … I still monitored, because retirement was still looming down the road."

The other three areas of potential detrimental reliance posited at trial concerning Ms. Gill-Mulson were the vacations she took, a car she purchased with equity from her home, and an Avon Walk she participated in for charity where she explicitly or implicitly agreed to secure a

certain dollar amount through contributions from others or by direct payment. As for the two vacations, in her cross-examination at trial, she acknowledged that one of them was booked before the January Meeting, and the other she may still have taken even if the purported statement at the January Meeting had not occurred. As for the car she purchased by taking equity out of her home, whether or not she would have done it does not mean that her reliance was detrimental. She still has the car, and Plaintiffs did not demonstrate how its purchase affected her negatively. As for the Avon Walk, Ms. Gill-Mulson's testimony at trial established that she cannot say when exactly she committed to it, nor can she say definitively that she did it in reliance on Mr. O'Brien's statement. Plaintiffs failed to meet their evidentiary burden with respect to detrimental reliance.

  *v.*  *Must the promise be enforced to prevent injustice?*

At every juncture, Plaintiffs failed to meet their burden to prove promissory estoppel. As outlined above, there was no promise. If anything comforting was said that pertained to the employees of the district, it was at best a vague assurance. But even if a promise was made by Mr. O'Brien, it was simply not reasonable for Plaintiffs to rely on it. Finally, the detrimental impact of Plaintiffs' reliance is dubious at best. Given all this, the Court is unable to conclude that injustice would result from a failure to enforce the promise.

Plaintiffs were at-will employees before the January Meeting. They were at-will employees after the January Meeting. There were no restrictions placed on their at-will status by virtue of any promise made at the January Meeting. Plaintiffs' claim for promissory estoppel fails on every element.

**B.     The 1983 Claim**

Although the trial to the bench was exclusively devoted to the promissory estoppel issue, the ruling made on that issue impacts the § 1983 claim. The Court will set a hearing to address that matter at a later date.

### III. CONCLUSION

Plaintiffs bore the burden of proof at trial with respect to establishing the elements of promissory estoppel, and they ultimately failed to meet their burden. Therefore, it is:

>ORDERED that judgment shall enter in favor of Defendant and against Plaintiff on Plaintiff's claim for promissory estoppel.

DATED this 4th day of February, 2014.

BY THE COURT:

_____
RAYMOND P. MOORE
United States District Judge